# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: March 22, 2023

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *
JAMES LAGLE,                              *
                                         *
            Petitioner,                  *         No. 16-1053V
                                         *
v.                                       *         Special Master Gowen
                                         *
                                         *
SECRETARY OF HEALTH                      *         Decision on Damages;
AND HUMAN SERVICES,                      *         Shoulder injury and pain.
            Respondent.                  *
                                         *
*  *  *  *  *  *  *  *  *  *  *  *  *  *
```

*Leah V. Durant,* Law Offices of Leah V. Durant, PLLC, Washington, D.C., for petitioner.
*Christine M. Becer,* U.S. Dept. of Justice, Washington, D.C., for respondent.

### DECISION ON DAMAGES[1]

On August 25, 2016, James Lagle ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program.[2]  Petition (ECF No. 1).  Petitioner alleged that he suffered a right shoulder injury, which included pain and dysfunction, after receiving an intradermal influenza ("flu") vaccine on October 20, 2015.  *Id.*  A ruling on entitlement was issued on May 25, 2022, finding that petitioner suffered a right shoulder injury, and he is entitled to compensation.  Since that time, the parties have been unable to resolve damages in this case.

For the reasons discussed below, I find that petitioner is entitled to an award of damages in the amount of $130,000.00 for actual pain and suffering.

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), because this opinion contains a reasoned explanation for the action in this case, I intend to post it on the website of the United States Court of Federal Claims.  The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7.  Before the opinion is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy."  Vaccine Rule 18(b).  An objecting party must provide the court with a proposed redacted version of the opinion.  *Id.*  If neither party files a motion for redaction within 14 days, the opinion will be posted on the court's website without any changes.  *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act").  Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

## I.      Relevant Procedural History

The Ruling on Entitlement provides a procedural history from the time petitioner filed the petition until the Ruling on Entitlement, and that procedural history is incorporated herewith and shall not be repeated.

After I issued a Ruling on Entitlement, finding that petitioner was entitled to compensation, the parties engaged in unsuccessful settlement discussions.  On November 18, 2022, petitioner filed a status report stating "the parties have been unable to resolve informally the issue of damages," and petitioner requested "that this case be slated for further litigation to determine the award of damages."  Petitioner ("Pet.") Status Repot (ECF No. 85).  Accordingly, I directed the parties to file briefs to support their respective positions on the issue of damages.  Scheduling Order (ECF No. 86).  Having heard extensive testimony as to the petitioner's pain and suffering at the time of the entitlement hearing, I did not see a need for further hearing and will decide the issue of damages with the benefit of the briefing by the parties.

On March 14, 2023, both parties filed briefs on damages.  Pet. Brief (ECF No. 87); Respondent's ("Resp.") Brief (ECF No. 88).

This matter is now ripe for adjudication.

## II.     Legal Standard

The Vaccine Act provides that "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury," a petitioner may recover "an award not to exceed $250,000." 42 U.S.C. § 300aa-15(a)(4).  With regard to pain and suffering and all other elements of damages, the petitioner bears the burden of proof and the medical records are the most reliable evidence of petitioner's condition.  *See, e.g.*, *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); *Shapiro v. Sec'y of Health & Hum. Servs.,* 101 Fed. Cl. 532, 537-38 (2011).

Prior to my appointment as a special master, former Chief Special Master Golkiewicz and others developed an approach with the goal "to fairly treat all petitioners" by "creat[ing] a continuum of injury", in which the statutory cap was reserved for the most severe injuries and lower awards were made for less severe injuries.  *Hocraffer v. Sec'y of Health & Human Servs.*, No. 99-533V, 2007 WL *914914, at *5 (Fed. Cl. Spec. Mstr. Feb. 28, 2007).  In *Graves*¸ Judge Merow granted review of a special master's pain and suffering award, holding that the "continuum" approach was not "rooted in the statute or precedent".  *Graves v. Sec'y of Health and Human Servs.,* 109 Fed. Cl. 579, 590 (2013).  Judge Merow set forth a different approach in which the first step is to assess an individual petitioner's pain and suffering by looking to the record evidence, without regard to the $250,000 cap.  Only then as a second step, if the award would exceed $250,000, must it be reduced to that maximum.  *See id*. at 589-90.

2

In the Vaccine Program's subsequent history, special masters have of course not been bound by *Graves*.[3] However, they have found it to be persuasive. *See, e.g.*, *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at \*10 (Fed. Cl. Spec. Mstr. Moran April 19, 2013) ("Under the interpretation of the statute offered in *Graves*, cases that used the spectrum approach, such as *Hocraffer* and *Long*, are no longer useful measuring points"); *Reed v. Sec'y of Health & Human Servs.*, No. 16.1670V, 2019 WL 1222925, at \*12 (Fed. Cl. Chief Spec. Mstr. Dorsey Feb. 1, 2019) ("it must be stressed that pain and suffering is not based on a continuum"); *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224, at \*5 (Fed. Cl. Spec. Mstr. Oler May 2, 2019) ("Pain and suffering is not, however, determined based on a continuum"); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069, at \*13 (Fed. Cl. Spec. Mstr. Corcoran July 29, 2019) ("… special masters appear to have accepted *Graves*'s methodology since issuance of that decision… I will apply it herein as well, although I do so mindful of the need to consider the overall strength of petitioner's showing herein"), *motion for review granted and remanded on other grounds,* 147 Fed. Cl. 131 (2020); *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1364V, 2020 WL 5509686, at \*3 (Fed. Cl. Chief Spec. Mstr. Corcoran Aug. 7, 2020) ("it must be stressed that pain and suffering is not based on a continuum"). I agree with this prevailing approach and have followed it in assessing pain and suffering damages in other SIRVA cases. *See Desai v. Sec'y of Health & Human Servs,* No. 14-811V, 2020 WL 8768069 (Fed. Cl. Spec. Mstr. Dec, 21, 2020), *recon. denied,* 2020 WL 8184767 (Fed. Cl. Spec. Mstr. Dec. 18, 2020).; *Yost v. Sec'y of Health & Human Servs.,* No. 18-288V, 2022 WL 4593029 (Fed. Cl. Spec. Mstr. Aug. 29, 2022); *Youngmark v. Sec'y of Health & Human Servs.,* No. 17-1431V, 2022 WL 2306867 (Fed. Cl. Spec. Mstr. May 25, 2022); *Galante v. Sec'y of Health & Human Servs.*, No. 18-1933V, 2023 WL 1515357 (Fed. Cl. Spec. Mstr. Jan. 13, 2023). I assess the full value of the damages in a particular case before me, then apply the statutory cap if that becomes necessary.

There is no mathematical formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D.*, 2013 WL 2448125, at \*9 ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *Id.* at \*9 (internal citations omitted). I find it appropriate to also consider any impairments in function and/or lost ability to participate in activities which the petitioner previously enjoyed, as a result of the injury.

A special master may also consider prior pain and suffering awards, especially for similar injuries, from both inside and outside of the Vaccine Program to aid the resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). A special master may also rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

---

[3] Decisions of special masters and the U.S. Court of Federal Claims constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998). In contrast, the Federal Circuit's holdings on legal issues are binding on special masters. *Guillory v. Sec'y of Health & Human Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd*, 104 F. App'x 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Human Servs.*, No. 13-159V, 2014 WL 504728, at n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

### III.   The parties' arguments

### a.  Petitioner's position

Petitioner requests an award of $185,000.00 in pain and suffering, and petitioner is not requesting reimbursement for past medical expenses or submitting a wage loss-claim. Pet. Brief at 8. Petitioner states that, "the Special Master must carefully review the particular facts and circumstances of any particular case, the course of the disease, the physical and mental anguish endured by petitioner, and the residua of the injury." *Id.*

Petitioner argues that he "experienced very serious shoulder pain and dysfunction since his vaccination in October 2015. His pain was immediate and became progressively worse." *Id.* Further, petitioner asserts that his right shoulder injury "affected his whole life," including, affecting "his ability to work and his ability to enjoy the life he knew as an active hunter and fisherman." *Id.* at 8-9. Petitioner states that he has "suffered greatly from the influenza vaccination administered to him seven and half years ago. His treatment course has involved multiple doctor's appointments, physical therapy, an MRI, a painful steroid injection, and surgery, none of which has fully relieved his pain." *Id.* at 9.

Petitioner also asserted that his shoulder injury was "severe," and that his pain became "progressively worse over time." Pet. Brief at 9 (citing Pet. Ex. 3 at 10; Tr. 25-26). He stated that the physical therapy sessions did not improve his condition and instead, "*exacerbated* his pain." *Id.* (original emphasis). Further, the conservative treatment that petitioner attempted, which included over the counter medication, physical therapy, and a cortisone injection were ineffective in controlling his pain. *Id.* Petitioner also stated that his pain levels reached a "10/10 with no relief in sight. Two months after surgery, [he] was still experiencing a 10/10 level of pain. Starting about three months after surgery, his pain fell to a 3-4/10 and now he experiences pain at a 2-3/10 level." *Id.* at 9-10.

Then petitioner states that he suffered emotional pain as a result of his shoulder injury. Pet. Brief at 10. He stated that "he had barely beaten cancer and was already in a weakened condition. He had just gotten back to work on a limited basis, working a limited schedule…His shoulder injury made him lose his employment altogether." *Id.* Petitioner stated that "the convergence of his cancer surgery and his shoulder injury-an injury that also required surgery- made the SIRVA a life changing experience for petitioner." *Id.*

Petitioner argued that the duration of his pain is another factor to be considered. Pet. Brief at 10. He asserted that he has suffered with a painful shoulder injury "for an incredible period of seven and half years," and that while his pain improved after surgery, he still has residual pain at a 2-3/10 on a daily basis. *Id.* Petitioner stated that he still needs over-the-counter medication to control his pain and he has to alter his sleep position to accommodate his shoulder injury. *Id.* Further, petitioner states that he is unable to fully participate in fishing, one of his favorite hobbies, and gave up hunting completely.

Importantly, petitioner argued that "the Special Master should consider that [his] [shoulder-injury] was to his dominant arm." Pet. Brief at 12. He stated that the shoulder injury to his right arm, has "made everything he has done in the last seven and half years that much more difficult for him." *Id.* at 12.

Petitioner averred that his case is similar to the *Hooper* case.  Pet. Brief at 11.  In *Hooper,* the petitioner was awarded $185,000.00 for pain and suffering for a left SIRVA, after undergoing some physical therapy, and an arthroscopic left shoulder surgery, the petitioner reported residual pain and limited range of motion, including "a permanent loss of shoulder function."  *Hooper v. Sec'y of Health & Human Servs.,* No. 17-12V, 2019 WL 1561519, at *8-9 (Fed. Cl. Spec. Mstr. Mar. 20, 2019).  Further, the petitioner in *Hooper,* was found to have suffered "moderate to severe pain….a period of approximately two years." *Id.* at 9.  Petitioner also distinguished his case from the *Reed* case, where the petitioner was awarded $160,000.00 for pain and suffering for a right SIRVA.  In *Reed,* the petitioner suffered a SIRVA and for a period of six months, was found to have had "severe shoulder pain," and then underwent shoulder surgery.  *Reed v. Sec'y of Health & Human Servs.,* No. 16-1670V, 2019 WL 1222925, at *14-15 (Fed. Cl. Spec. Mstr. Feb. 1, 2019).  The special master in *Reed* observed that petitioner's pain after the surgery continued, but she was able to get some relief with a cortisone injection and improved her range of motion nearly six months post-vaccination. *Id.* at 15.  Petitioner argued that the *Reed* case is different because of the duration for which he experienced shoulder pain. Pet. Brief at 11.

Petitioner also sought to differentiate his case from two non-surgical SIRVA cases, *Binette* and *Yost.*  Pet. Brief at 11.  Petitioner argued that his course and treatment was different from the petitioner in *Binette,* who received $130,000.00 in past pain and suffering and future pain and suffering of $1,000 per year, because the petitioner in *Binette* was not assessed as having permanent loss of function and she was not a surgical candidate.  *Id.*  In *Yost,* the petitioner was awarded $115,000.00 in pain and suffering after suffering a SIRVA, because her injury lasted approximately three years and had limited treatment. *Yost v. Sec'y of Health & Human Servs.,* No. 18-288V, 2022 WL 4593029 (Fed. Cl. Spec. Mstr. Aug. 29, 2022).  Petitioner argues that he should be awarded a higher amount than the petitioners in those two cases because he underwent surgery and was experiencing pain in his left shoulder for seven years after the administration of his vaccine.  Pet. Brief at 12.

Petitioner concluded his brief requesting $185,000.00 in pain and suffering for his right shoulder injury.  Pet. Brief at 13.

**b.  Respondent's position**

Respondent argues that petitioner should be awarded $65,000.00 for pain and suffering, "[b]ased on the facts of this case and the amount of damages awarded in recent, comparable cases involving SIRVA.  Resp. Brief at 1.

Respondent asserts that he "agrees with *Graves* to the extent it call for an individualized assessment of damages based on the specific facts of a petitioner's case," but also "disagrees"…to the extent that *Graves* is interpreted to endorse a methodology that would result in the vast majority of Vaccine Act claimants recovering the statutory maximum amount for pain and suffering.  *Id.* at 7. Respondent states that special masters should consider objective factors when making a determination for pain and suffering.  *Id.* at 13.  The factors considered by special masters include: (1) the ability of the injured individual to understand the injury; (2) the severity of the injury; and (3) the potential number of years the individual is subjected to the injury.  *Id.* (citing *McAllister,* No. 91-103V, 1993 WL 777030, at *3 (Fed. CL. Spec. Mstr. Mar 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995).  Respondent states that special masters may also draw from past experience with the similar

5

Vaccine Program cases, as well as their overall judgment to make a determination for pain and suffering. *Id.*

Respondent argued that he considered case specific facts to make his proffer to petitioner and by citing to other SIRVA cases in support of his position because by, "comparisons reasoned SIRVA damages decisions are becoming less and less helpful in resolving SIRVA cases." Resp. Brief at 14, n.7. Specifically, respondent argues that reasoned SIRVA damage decisions "offer a…small sampling of the SIRVA cases adjudicated in the Vaccine Program," and the "vast library of cases" that have been resolved by proffer "is far more useful for identifying comparable, full-value awards." *Id.* Additionally, respondent asserts that reasoned damages decisions, without referencing specific cases, are being resolved by "meeting-in-the-middle," and that this can result in an "inflated" award "in comparison to the scores of cases that respondent has successfully proffered and on which his original full-value assessment was based." *Id.*

In the Vaccine Program, the respondent uses the term "proffer" as "his assessment of the full value of damages," for a case, as opposed to a "stipulation" which represents a compromise between the parties. In light of respondent's argument, it is difficult not to note that the notion of "full value" of pain and suffering must by the very nature of pain and suffering represent a subjective opinion of value. In a proffer, the opinion is that of the respondent with which the petitioner ultimately accepts either because he or she agrees with the valuation or because he or she wishes to avoid further risk and delay in further litigating the case. Reference to the value of other cases may certainly be useful if enough is known about the specific facts of the cases, which are more readily available from reasoned damages opinions of Special Masters. Decisions on damages must consider the facts of the case before the court and not be based solely on a statistical analysis of other awards. As in this case, petitioners may not agree with the judgment of the respondent as to what represents full value for pain and suffering. They are certainly entitled to have the value decided by the court and the court is not bound by the respondent's opinion of full value or the petitioner's claim of case value.

In this case, respondent argues, that the full amount of damages of $65,000.00 is supported for three reasons. Resp. Brief at 15. First, respondent argues that petitioner delayed treatment for his right shoulder pain and dysfunction for three months before seeking medical treatment. *Id.* Respondent states that this delay in treatment "warrants a lower pain and suffering award," because it demonstrates that the severity was enough to be tolerated for a period of time. *Id.* The second reason is that petitioner's treatment course consisted of "one steroid injection and some physical therapy," and that his right shoulder surgery was for a "rotator cuff tear." *Id.* Essentially, respondent is arguing that petitioner's right shoulder surgery was *unrelated* to his right shoulder pain and dysfunction that was found to be caused by the influenza vaccine. Finally, respondent asserts that petitioner's "vaccine-related condition" resolved within one year. *Id.* Respondent states petitioner sought treatment five months after his shoulder surgery, and then he did not seek further treatment for four years. *Id.* Respondent argues that "it is reasonable to infer that he had a good outcome from his surgery and was recovered from his shoulder injury within approximately one year of his vaccination." *Id.* Respondent did reference the *Clendaniel* case to support his position that an award close to $65,000.00 in pain and suffering was appropriate. In *Clendaniel,* the petitioner requested an award of $80,000.00 for pain and suffering, emphasizing that he had two cortisone injections, two arthrocentesis procedures, and required treatment for fourteen months. *Clendaniel v. Sec'y of Health & Human Servs.,* No. 20-213V, 2021, WL 4258775 (Fed. Cl. Spec. Mstr. Aug. 18, 2021). Respondent had proffered $38,000.00. *Id.* at, *8. The special master in that case found that petitioner had suffered a "mild SIRVA," had "significant relief" with

steroid injections, and that petitioner's pain "was not particularly, or at least not consistently severe." *Id.* Further, the petitioner in that case did not have a rotator cuff tear that became symptomatic because of his SIRVA.

Concluding his argument, respondent states that while petitioner was aware of his injury, petitioner's injury was "clearly not severe," and that he recovered within one year, thus petitioner should receive a "modest" award.

## IV.    Discussion and conclusion

As noted above, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9. Impairment of function and loss of activities are also considered. It does not appear that the parties dispute petitioner's awareness of his injury. The record reflects that petitioner was aware of his injury and that the onset of his pain was within 48-hours of receiving the flu vaccine. *See Lagle v. Sec'y of Health & Human Servs.*, No. 16-1053V, 2022 WL 229903 (Fed. Cl. Spec. Mstr. May 25, 2022). Petitioner and his family testified that he complained of soreness in his right arm on the same day that he received the flu shot and that his shoulder became progressively more painful over the next two days. Tr. 8. Additionally, the medical records reflect that petitioner consistently associated the onset of his right shoulder pain to the flu vaccination he received on October 20, 2015. Thus, the focus of the dispute between the parties is on the severity and duration of petitioner's injury.

### a.   Severity of the injury

I find that petitioner experienced a moderate to severe right shoulder injury. While petitioner delayed seeking treatment for his right shoulder pain following his vaccination, he credibly testified that he began to experience pain in his right shoulder within two days of the vaccination. Additionally, petitioner's fiancé testified that in the early days post vaccination in October she called petitioner's primary care physician, Dr. Sutton, to inform the doctor about the pain petitioner was experiencing. Tr. 42. She testified that a nurse left a message telling petitioner to take Tylenol for his shoulder pain. *Id.* at 44. Petitioner and Ms. Beatty testified that he continued to do that until January, when he had an appointment with Dr. Sutton specifically focused on his shoulder pain.

Dr. Srikumaran also explained that patients who experience musculoskeletal pain typically wait weeks or months to seek medical care and evaluation. Tr. 122; Pet. Ex. 25 at 6. He stated that most people are hopeful that things will improve with time and at-home remedies. *Id.* Dr. Srikumaran testified that petitioner's doctor recommending Tylenol for the post vaccination shoulder pain would have likely given petitioner reassurance "to allow more time to pass even before seeking further follow-up care." Tr. 123. Additionally, Dr. Srikumaran cited to an article by *Shi et al.,* which observed that there are a "variety of potential obstacles may be responsible for the underutilization of medical treatment for pain." Pet. Ex. 34 at 2.[4] The article observed that more people who are suffering from chronic or recurrent pain seek medical treatment, compared to those who are suffering from acute pain. *Id.* at 4. Additionally, the article observed that 92% of those surveyed tried three or more alternative pain relief methods which included the use of over-the-counter medication, bed rest, massage therapy or going to a chiropractor. *Id.* at 6. As petitioner's pain was not considered chronic right away, he testified

---

[4] Shi, Q., et al., *People in Pain: How Do They Seek Relief?* 8 The Journal of Pain, 624-636 (2007). [Pet. Ex. 34].

that he used over-the-counter medication to alleviate his pain and it was not until it became chronic, four months later, did he seek an examination of his shoulder.

Additionally, delaying treatment or care does not necessarily reflect the severity of a petitioner's pain. Instead, a petitioner may have other barriers that prevent them from seeking treatment right away. In *Yost,* the petitioner delayed treatment for her SIRVA for nearly five months because she was in nursing schools and working part-time. *See Yost,* at *1, 9. In *Desai,* the petitioner also delayed treatment for multiple months because she was traveling out of the country to assist her elderly father. *See Desai,* at *2. The petitioner in *Yost,* reported that her pain level was a 7 out of 10 once she begun physical therapy, a pain level like the petitioner's reported pain in this case. Thus, a delay in treatment is not necessarily indicative of the level of pain a petitioner may be experiencing, but rather more of a reality of life's circumstances that result in delaying treatment.

At petitioner's first appointment for his right shoulder, he had "increased pain with both active and passive abduction," and was unable to abduct beyond 70 degrees "without considerable discomfort." Pet. Ex. 2 at 141. He received a steroid injection at this appointment. *Id.* Two weeks later, petitioner had his first physical therapy appointment where he reported that the steroid injection did not provide relief for his shoulder symptoms. Pet. Ex. 3 at 20. Petitioner reported that his pain was a 9/10 at its worst and 6/10 at its best. *Id.* Petitioner's right active range of motion was significantly reduced. *Id.* at 21. It showed that he only had 80 degrees of flexion (normal range of 180) and 85 degrees of active abduction (normal range of 180). *Id.* Passive range of motion was also reduced in all directions. *Id.* At his next physical therapy appointment on February 9, 2016, petitioner reported that his right shoulder pain had increased following physical therapy and with his home exercises. *Id.* at 18. On February 16, 2016, his sixth physical therapy appointment, petitioner reported that "he hasn't seen much change in his symptoms, and that he still has soreness in his shoulder when he is reaching away from his body." *Id.* at 6. Petitioner described a "stabbing pain in the lateral portion of his shoulder." *Id.* At this last physical therapy appointment on February 18, 2016, petitioner reported that his pain level was still a 6/10 at its best and a 9/10 at its worst. *Id.* at 1. While he did show improved range of motion in flexion and abduction, there was a notation that it was "painful." *Id.* at 2. At petitioner's appointment with orthopedist, Dr. Demuth, petitioner reported that he was having "trouble" with his right shoulder "for a number of months." Pet. Ex. 2 at 143. Dr. Demuth observed that petitioner had discomfort using his right shoulder "particularly elevating his arm above 90 [degree] position," and that petitioner had "subacromial space pain," upon internal and external rotation. *Id.* Petitioner was diagnosed with bursitis. *Id.*

The MRI of petitioner's right shoulder taken on March 16, 2016 revealed mild increased T1 and T2 signal within the supraspinatus and infraspinatus tendons. Pet. Ex. 2 at 365. Additionally, focal fluid signal intensity on the anterior aspect of the supraspinatus tendon was identified as "compatible with a focal high-grade tear involving 70%," of the tendon. *Id.* The impression was "mild/moderate central cuff tendinopathy with 0.8 cm infraspinatus insertional high-grade partial tear and a moderate partial tear in the superior fibers of the subscapularis tendon," along with "mild bursitis" and a "mild partial tearing on the intra-articular biceps tendon." *Id.* at 366. Ultimately, petitioner underwent a right shoulder rotator cuff repair and acromioplasty on May 17, 2016. *Id.* at 382. On October 4, 2016, four months after petitioner's surgery, he had a follow-up appointment with Dr. Demuth where he reported "no major pain in his right shoulder." Pet. Ex. 6 at 1. Additionally, Dr. Demuth noted that petitioner was able to elevate both arms above his head. *Id.*

Despite petitioner having improvement in his mobility nearly a year after his surgery, his more recent medical records and testimony indicate that he was still experiencing residual pain, albeit not at the same intensity as before. During the hearing, petitioner testified that his pain level "got extremely better," and dropped to about a 3-4/10. Tr. 28. However, he also explained that he was taking approximately 500 milligrams of Tylenol daily for the residual shoulder pain. *Id.* Additionally, petitioner explained that his shoulder pain was disrupting his sleep. Tr. 32; Pet. Supp. Affidavit ("Aff.") at ¶ 2.

One important consideration to the assessment of pain and suffering is how the injury impacted the petitioner's personal life. This injury was to petitioner's dominant arm, and he testified that it made it more difficult for him to enjoy hobbies, such as fishing and hunting. In petitioner's most recent affidavit, he stated that he needs to take repeated breaks during cast fishing and that casting the line is difficult. Pet. Supp. Aff. at ¶ 4. Further, petitioner stated that he has given up hunting altogether because it is difficult to shoot a firearm. *Id.*

The respondent's argument that petitioner's shoulder surgery was unrelated his vaccine-related injury is unpersuasive, as it stands in contrast to the medical expert opinions presented in this case, as well as the *Atanasoff* article, which respondent relied upon when adding SIRVA to the Vaccine Injury Table. Dr. Srikumaran acknowledged that petitioner, like many people of his age, likely had an underlying rotator cuff tear. Pet. Ex. 25 at 7. Dr. Srikumaran then observed that despite petitioner's occupation as an auto technician, petitioner's underlying rotator cuff injury was "not symptomatic." *Id.* Dr. Srikumaran opined that the flu vaccine initiated an inflammatory response which caused pain "in previously long standing, silent, chronic degenerative conditions." *Id.* at 8. Dr. Srikumaran's opinion was consistent with the *Atansoff* article, which explained that MRI findings of rotator cuff tears in patients with post-vaccination shoulder injuries "may have been present prior to vaccination and became symptomatic as a result of vaccination-associated synovial inflammation." Pet. Ex. 21 at 3.[5] Rotator cuff tears or other underlying shoulder pathology may not be a direct injury from a vaccine administration, but the rapid onset of pain and reduced range of motion after vaccination is "consistent with a robust and prolonged immune response." *Id.* at 3. Rotator cuff repair surgery following a SIRVA is well documented in other cases as not only a sequalae of the vaccine-injury, but a consideration when assessing the severity of a petitioner's injury. *See Wilson v. Sec'y of Health & Human Servs.,* No. 19-35V, 2021 WL 1530731, at *3 (awarding petitioner $130,000.00 for past pain and suffering, where petitioner's MRI revealed partial thickness tears in the subscapularis and infraspinatus tendons and petitioner underwent surgery); *Dobbin v. Sec'y of Health & Human Servs.,* No. 16-854, 2018 WL 4611267, at *3 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $120,000.00 in actual pain and suffering, where petitioner had a full thickness rotator cuff tear and underwent an arthroscopic surgery on petitioner's right shoulder).

Based on the record, including petitioner's testimony, the testimony of his witnesses, and his treatment course, petitioner appears to have suffered a severe to moderate right shoulder injury. Petitioner's injury began with acute pain. After his surgery in October 2016, his pain levels decreased, but remained persistently mild at a 2 out of 10.

---

[5] Atanasoff, S., et al., *Shoulder injury related to vaccine administration,* 28 Vaccine 8049-8052 (2010). [Pet. Ex. 21].

### b.  Duration of petitioner's injury/suffering

As explained above, I find that there is evidence that petitioner suffered from a severely painful shoulder injury for a period of eight months and then had mild to moderate symptoms for a period of six years.  From the time petitioner received the flu vaccine on October 20, 2015, until his shoulder surgery on May 17, 2016, the record demonstrates that petitioner's pain was severe or moderate.  Petitioner explained that his right shoulder pain was a 9/10 at its worst and a 6/10 at it's best, putting his pain level at that time on the higher end of the scale.  Additionally, petitioner's shoulder mobility was significantly reduced.

At petitioner's follow-up appointment on October 4, 2016, four months post-surgery, petitioner reported that he was doing well and that he had no major pain in his right shoulder. Pet. Ex. 6 at 1.  It does not appear that petitioner engaged in physical therapy following his right shoulder surgery. Further, at this appointment, petitioner appeared to have improved range of motion although the specific range of motion was not documented by his physician.

There was a gap in treatment for petitioner's right shoulder from the October 4, 2016 appointment until an appointment on February 9, 2021 with orthopedist Dr. Philip Bosha.  *See* Pet. Ex. 36.  Between that time, petitioner was routinely seen by Dr. Allison Holmes for a variety of other medical issues, but at all appointments, petitioner's musculoskeletal examination noted: normal range of motion.  *See* Pet. Ex. 8 at 10, 18, and 34.  On February 9, 2021, petitioner reported that he was experiencing pain with numbness and tingling going down to his right fingertips.  *Id.*  It does not appear that Dr. Bosha measured petitioner's range of motion but did an ultrasound of his right shoulder which showed degenerative changes and tendinopathic changes of the infraspinatus and supraspinatus tendons. *Id.*  There were no follow-up appointments in the record.

While petitioner offered the *Reed* and *Hooper* cases for comparable facts and circumstances, I find that petitioner's case is more like *Wilson*.  In *Wilson,* the petitioner received a flu vaccine in her right arm, which was also her dominant arm.  *Wilson,* at *3.  Further, the petitioner was found to have suffered a "moderately severe injury," for which she had significant reduction in range of motion for four months.  *Id.*  The petitioner in *Wilson* also underwent arthroscopic surgery approximately seven months after vaccination, which initially provided pain relief and improved range of motion, but then sought treatment almost one year later for some discomfort in her arm while rating her pain at a 3 out of 10.  *Id.,* at *3-4.  The special master in that case found that an award of $130,000.00 for past pain and suffering was appropriate because of the treatment gaps post-surgery.  The petitioner showed she had some residual symptoms, but they were not severe enough to seek further treatment.

In *Hooper,* the special master awarded $180,000.00 for pain and suffering, the petitioner engaged in 50 physical therapy appointments for nearly four months after surgery.  *Hooper,* at *7.  Additionally, the petitioner in *Hooper* had continuous follow-up treatment for his shoulder after being discharged from physical therapy.  *Id.* at *4.

Here petitioner demonstrated that his initial pain was severe, but the records show that post-surgery his pain symptoms had decreased and range of motion had improved.  Additionally, petitioner had a nearly five-year gap in treatment for his right shoulder.  Treatment gaps are a relevant consideration in determining the degree of petitioner's pain and suffering.  *Dirksen v. Sec'y of Health & Human Servs.,* No. 16-1461V, 2018 WL 6293201, at *9-10 (Fed. Cl. Spec. Mstr. Oct. 18, 2018).  There

10

is no evidence that petitioner pursued additional physical therapy or treatment in the five years before the appointment with Dr. Bosha, nor is there evidence that he pursued treatment after that appointment.

Petitioner also testified that he was not able to continue with his part time employment as an auto-body mechanic, that he had given up hunting altogether and was limited in his other avocation fishing. He testified that he was no longer able to do yard work other than lawn mowing or a riding mower. It is important to remember that this injury was to his right dominant arm which caused additional functional limitations than an injury to his non-dominant arm would have.

Based on petitioner's statements regarding his pain levels at the beginning of his injury compared to his reports of ongoing pain, although less, after the surgery and his improved range of motion, together with limitations in his normal activities, I find that an award of $130,000.00 is an appropriate award for petitioner's actual or past pain and suffering.

## V.      Conclusion

Based on the record as whole and arguments of the parties, **I award petitioner a lump sum payment of $130,000.00, representing compensation of $130,000.00 for his actual and past pain and suffering.  This amount represents compensation for all damages that would be available under Section 15(a).**

**The clerk of the Court is directed to enter judgment in accordance with this decision.[6]**

**IT IS SO ORDERD.**

s/Thomas L. Gowen
Thomas L. Gowen
Special Master

---

[6] Entry of judgment can be expedited by each party's filings of a notice renouncing the right to seek review.  Vaccine Rule 11(a).